### J. C. THOMPSON v. THE STATE.

#### No. 7224.   Decided November 28, 1923.

**1.—Murder—Evidence—Adequate Cause.**

Where, upon trial of murder, defendant offered in evidence, on the issue of manslaughter, certain instruments and documents pertaining to his claim to the land in controversy in a certain suit between him and deceased, and covered by a writ of injunction by the plaintiff, going to show that the land covered by the writ of injunction was the separate property of defendant's wife, and that deceased had no right to the land, or to sue out the writ of injunction, it having been shown that the cause of the killing was about this controversy over said land, and this, although, defendant did not testify as a witness up to that time, following Lewis v. State, 48 Texas Crim. Rep., 614, and this ruling of the court constituted reversible error. Following Gaines v. State, 58 Texas Crim. Rep., 631, and other cases.

**2.—Same—Evidence—Void Judgment—Insanity.**

There was no error in the court's ruling refusing to admit in evidence that during the year 1915 defendant was confined in the State asylum for the insane on the ground that the proceeding whereby the confinement resulted was by a commission of physicians, and that the purported judgment thereunder was void. Following Apolinar v. State, 92 Texas Crim. Rep., 583.

**3.—Same—Insanity—Evidence—Non-Expert Testimony.**

Where appellant's sister had testified among other things that defendant would take spells at night and would run about and upon such occasions would say things, she should have been allowed to testify what he did say at such times as a basis of her non-expert testimony.

**4.—Same—Argument of Counsel.**

As the argument of State's counsel in the way of prophesying what appellant's witnesses would do in the event he should be acquitted on the ground of insanity, etc., is not likely to occur on another trial, the same need not be discussed.

Appeal from the District Court of Hill. Tried below before the Honorable Horton B. Porter.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*James P. Cogdell* and *Collins, Dupree & Crenshaw,* for appellant. On question of instruments and documents, Burton v. State, 178 S. W. Rep., 334; Gay v. State, 125 id., 896, and cases stated in opinion.

*W. A. Keeling,* Attorney General, and *C. L. Stone,* Assistant Attorney General, for the State.

HAWKINS, Judge.—Appellant was convicted for the murder of J. C. Baldwin, his punishment being fixed at fifteen years confinement in the penitentiary.

It is urged that an error which calls for the reversal of the case was committed by the trial court in the refusal to permit the introduction of certain evidence hereinafter referred to. At the time it was offered by appellant the testimony already before the jury had established the following facts, or raised issues relative thereto. Prior to the time of the killing a controversy had arisen between deceased and appellant with reference to a seventy-nine acre tract of land upon which appellant and his wife lived at the time of the homicide which was known as the Nixon place. Appellant and his wife were claiming said place as was also deceased. The Nixon place contained something over one hundred acres but the part to which deceased laid claim embraced only some seventy-nine acres. Appellant was mad at deceased about the latter's claim to said seventy-nine acres and thought deceased was trying to impose upon him and take his land away from

him.  On the day before the homicide deceased had filed in the District
Court of Ellis County a suit against appellant and his wife and
William Brandon, a tenant of appellant, alleging in substance that
deceased was the legal owner of the seventy-nine acres of land; that
he had permitted appellant to cultivate it during the years 1920 and
1921; that said rental contract had expired; that appellant was a
shiftless sort of fellow, reckless in his manner and method of cultivat-
ing the land and was not able to manage the farm and although his
rental term had expired he was attempting to plow up the ground
and plant another crop; that appellant was preventing deceased from
renting the land or putting a tenant upon it; that Brandon had
agreed with appellant to cultivate a part or all of the land for the
year 1922; that deceased was a brother-in-law of appellant, having
married his sister; that in February 1920 the mother of appellant
died leaving a will by the terms of which deceased was appointed
independent executor and providing that the property bequeathed to
appellant should remain in the hands of deceased as trustee.  The
petition prayed for a writ of injunction restraining appellant and
his tenant Brandon from any further cultivation or connection with
said land.  The writ had been issued and a copy of it left at ap-
pellant's home on the day before the homicide and another copy had
been served on Brandon on Sunday morning a few hours before the
killing.  The injunction writ was sweeping in its character and in a
general way restrained appellant, his wife and tenant from going up-
on the said seventy-nine acres and from doing anything upon or with
reference to the land.  Upon the day of the homicide and after said
injunction writ had been served upon appellant and Brandon, ap-
pellant and Brandon went from appellant's home to the old Thomp-
son homestead about eleven o'clock in the morning.  Deceased, Wil-
liam A. Thompson (a brother of appellant) and other members of
the family were present and all ate dinner together.  Before dinner
no mention was made of the injunction suit and appellant at that
time appeared to be in a good humor.  After dinner appellant went
upstairs with his sisters, but Brandon, appellant's brother and de-
ceased remained downstairs.  Brandon inquired of deceased with
reference to the injunction suit and deceased then called appellant
to come down, and appellant replied: "We can't talk."  Deceased
called for appellant two or three times and insisted on his coming
down, which appellant finally did and asked deceased why it was he
had filed the suit, to which deceased replied that he had to do that to
get the disputed land in court to be contested.  Brandon then re-
quested deceased to read the petition and deceased got some papers
and began reading them.

He read at least a part of the petition in the injunction suit and
read from some paper, language corresponding to the language in the

injunction writ forbidding appellant and Brandon from doing anything with the land. In that connection deceased also read from some paper the following: "I hereby appoint Jacob Baldwin (deceased) executor or trustee of June Thompson's (appellant) part of the estate because of the fact that June is *non compos mentis.*" About the time deceased read this part of the paper appellant got up and left the room without saying anything. Deceased signed· and delivered to Brandon a release or permission for him (Brandon) to cultivate the seventy-nine acres covered by the injunction but to pay to deceased the rents for the year 1922. This was with reference to the place where appellant and his wife and Brandon lived and made their home. About twenty minutes after appellant left the room he returned and the killing occurred. On several occasions prior to the homicide Mrs. Lomax, a sister of appellant, had taken deceased out to where appellant lived and deceased had tried to induce appellant to sign some papers relative to the place. Appellant in each instance refused to sign and told deceased to keep away from his home and off of his premises. On the morning of the killing and just before deceased called appellant to come downstairs he had told Mrs. Lomax that deceased had gotten out an injunction restraining him from his home and land and that he wanted to go out and seek a position and get something to do. She testified that when deceased called appellant to come down and listen to the reading of the papers appellant replied: "I have heard all of those papers this morning, Judge Baldwin, by the constable at Waxahachie, don't want to hear them any more;" that deceased called him a second time and said: "You must come down and listen to these papers." Mrs. Lomax testified that at the time of the killing appellant was so mad that he did not know his name or even did not see his sister or know that she had him by the arm; that he was mad as anybody else would be provoked to madness. There was no semblance of self-defense raised by the evidence, it being shown that appellant walked into the room and without a word began firing at deceased and pursued him from room to room firing a number of shots.

Waiving the issue of insanity, the only motive shown for the killing was the controversy between appellant and deceased over the seventy-nine acres of the Nixon tract. After the killing appellant told a witness that he had killed old man Baldwin; that he was glad it was over, that he had been troubling him for a number of years. In this state of the record appellant offered in evidence a contract made by appellant and his wife with the firm of Baldwin & Baldwin, attorneys, (deceased being one of the members of said firm) by which the attorneys undertook to recover the land in controversy and were to have one-half of such land as might be recovered. The· petition filed by the firm of Baldwin and Baldwin in the District Court of Ellis County for the recovery of this land, and the judgment of the court in favor

of appellant's wife were also offered in evidence; also the will of W. W. Nixon, in which he bequeathed to his sister, Fannie Nixon, who afterwards married appellant, seventy-two and one-third acres (being a part of the same land in controversy) during the time she remained unmarried, but providing in the event she married it should revert to the Odd Fellows Orphan Home of Corsicana. Appellant also offered in evidence a deed from him and his wife to deceased for one hundred and one acres of land, embracing the seventy-nine acres about which the controversy existed, and also a deed subsequently executed by deceased to appellant's wife reconveying twenty-five acres of this land, but providing that appellant's wife should not have authority to sell, mortgage, lease or convey the same, and in the event she undertook to do so the title of said land should revert to the deceased as trustee for Mrs. Thompson. Appellant offered the instruments and documents heretofore named in support of his claim and contention that the land covered by the injunction writ was the separate property of his wife and that deceased had no right to the land and no right to sue out the writ of injunction, as bearing upon the issue of manslaughter. The learned trial judge excluded the evidence upon the ground that appellant had not testified to facts which would make them pertinent. The bill shows the following statement of the court with reference to it. ''I think the instruments would be admissible in the event the defendant were to take the stand and give testimony in the case that would make them admissible, because no one else can testify as to what was in his mind or what was bearing upon his mind at the time.''

It may be stated here that appellant did not testify as a witness. It has been established by the decisions of this court that it is not necessary that accused testify to the passion which would constitute manslaughter in order to require the submission of that issue to the jury, it only being essential that the facts in evidence raised the issue. Lewis v. State, 48 Texas Crim. Rep., 614, 89 S. W. Rep., 1073; Steen v. State, 88 Texas Crim. Rep., 257; 225 S. W. Rep., 529. The learned trial judge believed the issue of manslaughter was raised by the evidence because he submitted it to the jury. The rejected evidence shows that Mrs. Thompson's brother willed to her seventy-two and one-third acres embraced in the land in controversy, providing that if she married the property should go to the Odd Fellows Orphans Home at Corsicana; that she did afterwards marry appellant and the property was taken charge of by the Odd Fellows Orphans Home; that appellant and his wife employed deceased and his partner to recover the land, agreeing to give them one-half of the property recovered; that the suit instituted under this contract of employment resulted in a judgment whereby title and possession of the seventy-two and one-third acres of land was decreed to appellant's

wife. By the terms of the contract the firm of Baldwin & Baldwin became entitled to one-half of said land, or thirty-six acres; that instead of a deed for that amount of land to the firm, there was executed by appellant and his wife to deceased alone a deed for one hundred and one acres of land which included the seventy-two and one-third acres. (The reason for the discrepancy does not appear;) that thereafter deceased by a special warranty deed convened to appellant's wife, not one-half of the land in controversy, but only twenty-five acres, with the provisions heretofore mentioned. That the killing resulted from ill feeling on appellant's part because of the controversy over the land is not debatable. The suit filed by deceased on the day before the homicide and the issuance of the injunction writ precipitated the killing, but it is apparent from the testimony that long before this the controversy over the ownership of the seventy-nine acres existed between appellant and deceased. If the excluded evidence threw light on appellant's attitude in the matter and would have served to aid the jury in determining his state of mind when it became apparent that deceased was going to oust him from the land over which the controversy had long existed, and recognize appellant's former tenant, Brandon, as a tenant of deceased and exclude the latter entirely, then its exclusion was such an error as demands a reversal of the judgment. We have been unable to reach any other conclusion than that the tendered evidence should have been received. We have stated at length the evidence before the jury up to the time the excluded documents were offered, and from this is apparent, we think, the pertinency of the rejected evidence without any elaborate reasoning. Gaines v. State, 58 Texas Crim. Rep., 631, 127 S. W. Rep., 181; Burton v. State, 77 Texas Crim. Rep., 134; 178 S. W. Rep., 334.

Appellant offered to prove by his sister, Mrs. Cora Winn, that during 1915 he was confined in the State Asylum for the Insane at Terrell for about eight months. The evidence was excluded on the ground that the proceeding whereby the confinement resulted was by a commission of physicians, and that the statute which so provided had been held unconstitutional, and the purported judgment thereunder was void. There was no error in such ruling. White v. White, 108 Texas 570, 196 S. W. Rep., 510; Barton v. State, 89 Texas Crim. Rep., 387; 230 S. W. Rep., 989; Apolinar v. State, 92 Texas Crim. Rep., 583, 244 S. W. Rep., 813.

Upon the issue of appellant's sanity his sister, Mrs. Winn, had testified, among other things, that he would "take spells at night and would run around the house, and go about the yard and farm, and that upon such occasions she would sometimes hear him say things she did not like very well." She was then asked, "Just tell the jury what was in June's (appellant's) mind if he expressed it to you on

those occasions.'' Objection was sustained to the question. If permitted to answer she would have stated that when appellant would run through the house and over the farm at night he would curse imaginary people and would say he was going to get his gun and kill a lot of s—o-a-b—s around there, that they .were after him, and that he had stood for all of it he was going to; that in fact no one was after him at such times. The question is peculiarly framed, but it ₃ apparent from the bill that its purpose was to elicit from the witness what appellant said at the time explanatory of the conduct she had related. The value of a non-expert witness's opinion on the question of insanity depends upon whether the facts stated by the witness appeal to the jury as forming a reasonable basis for the conclusion reached. Upon another trial the witness should be permitted to state what appellant said as explanatory of what he was doing and as disclosing what was in his mind at the time.

We find two bills of exception to certain argument of counsel for the prosecution. We think they go a little far in the way of prophesying what appellant's witnesses would do in the event he should be acquitted on the ground of insanity and an effort then be made to send him to the asylum, but as such argument will not likely be indulged in upon another trial we do not discuss the question further.

For the errors pointed out, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*